UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
CHRISTOPHER MYERS,                        02 Civ. 4813 (JSR)(DFE)
                    Petitioner,

                                          REPORT AND
        - against -                       RECOMMENDATION
                                          TO JUDGE RAKOFF
CHARLES GREINER,
                    Respondent.
--------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

        The _pro_ _se_ habeas petition of Christopher Myers challenges

his 1997 conviction for Murder in the Second Degree, after a jury

trial before Justice Caesar D. Cirigliano in Supreme Court, Bronx

County.  The judge imposed a prison sentence of 20 years to life.

The Appellate Division unanimously affirmed the conviction on May

17, 2001, _People v. Myers_, 283 A.D.2d 258, 728 N.Y.S.2d 126 (1st

Dep't), _lv. denied_, 96 N.Y.2d 922, 732 N.Y.S.2d 639 (2001).

        Myers filed his initial petition in our Court on June 21,

2002, and his amended petition on December 30, 2002.  On February

6, 2003, I stayed the proceedings in our Court while Myers

returned to State court.  That stay remained in effect for well

over two years.  Briefing was then completed in January 2006.

For the reasons set forth in this report, I recommend that Judge

Rakoff deny the petition.

The Evidence at Trial

On January 2, 1995, Rodney (Randy) Young was fatally shot by petitioner Myers near the front door of the apartment residence of Myers and his fiancee Shaniqua Williams.

Randy Young's best friend was Albert Glover, who testified as follows. (Tr. 23-102.) Young was about 6'2" tall and weighed 265 pounds. He had worked as a bouncer at a Bronx club until the early summer of 1994. Williams had also worked at that club until March 1994. Glover met her once, at a time when she and Young were both working at the club. On Sunday, January 2, 1995, Young and Glover each had one small drink of alcohol with their wives at 7:00 p.m. Young then accompanied Glover as Glover drove around on various errands. At Young's request, Glover drove him to Williams' apartment building at about 9:30 p.m. Young went in for a visit that was supposed to take "one minute." A few minutes later, Glover heard a bang and discovered that Young had been shot.

Shaniqua Williams was the main witness for the prosecution, and she testified as follows. (Tr. 259-373, 452-77.) At approximately 9:30 to 10:00 p.m., she, her young daughter and Myers were in her ground-floor apartment at 653 East 182nd Street. While Myers was taking a shower, the buzzer rang. Williams started to go to the intercom to respond, but Myers

emerged in his bathrobe, dripping wet, and reached the intercom before she did. A man's voice said, "This is Randy; is Shaniqua home?" Myers pushed the button to enable the man to enter the lobby. He opened the apartment door and saw Young. Myers and Young argued, and Williams tried to pull Myers back from the door. However, Myers shot Young in the head. (The single shot perforated Young's brain; he died two days later, Tr. 402.) Five minutes later, Myers was fully dressed. He told Williams that he was sorry, that he didn't mean to shoot the man, and that he loved her. He then left. (Tr. 339-43).

Myers, who was born on March 18, 1971, testified in his own defense. As of January 2, 1995 he was working with his mother as a florist. He had attended three colleges. He had never been convicted of a crime. (Tr. 494-96.) Basically, he presented the jury with two defenses: (1) he was in fear because Young was charging him at the door, and (2) as he resisted, his gun went off accidentally. He and his mother then went to Washington, D.C. and stayed there for ten days, but then they returned and he surrendered.

## Proceedings in State Court

This case has a protracted history. At the end of this Report, I have annexed a chronology of the State court proceedings, from the 1997 verdict through 2005. From 1995 to 1997, Assistant District Attorney Frank Ianucci offered a

manslaughter plea if Myers would allocute that he acted under extreme emotional disturbance ("EED") on the basis of a lovers' triangle. Apparently, three successive appointed attorneys urged Myers to accept that offer, but he adamantly refused. (Exh. 1, Ianucci Aff. ¶¶ 4-7; Sent. Tr. 52-54.) Myers's mother then retained attorney Earl A. Rawlins, who handled the trial.

After the jury verdict, Myers filed a pro se motion under Criminal Procedure Law ("CPL") §330.30. During the hearing on that motion, at Tr. 60, ADA Ianucci stated: "According to the record[,] an 18-B attorney was appointed [--] Mr. Alemany a highly competent lawyer. He spent three months working on a 330.30 motion. The minute he filed the motion, he's fired with the court's permission for no reason whatsoever." Myers's mother then retained Marlon Kirton, who argued the 330.30 motion [1] and then represented Myers at sentencing. There were post-sentence motions; on one, Myers was represented by retained attorney Michael Warren. On the direct appeal, Myers was zealously represented by Legal Aid attorney Jeffrey I. Richman, who submitted a 70-page brief to the Appellate Division and a 7-page letter to Judge Howard A. Levine of the Court of Appeals.

The Habeas Proceeding in Our Court

In this habeas proceeding, Myers has had no attorney and has continued his practice of filing lengthy papers and exhibits.

---

[1] Mr. Kirton also filed a written 330.30 motion. (See Sent. Tr. 5.)

His most pertinent submissions in our Court are:

    Amended Petition dated 10/19/02, filed 12/30/02
        (Docket #6)

    Memorandum of Law dated 12/17/02, filed 1/3/03
        (114 pages plus 23 exhibits)(Docket #7)

    Amended Supplemental Memorandum of Law dated 5/18/05
        (Docket #14)

    Reply Affidavit postmarked 10/11/05 (Docket #18)

    Letter dated 1/15/06 (Docket #24).

    Jonathan Zucker of the Bronx District Attorney's Office has represented the respondent throughout this habeas proceeding. His most pertinent submissions in our Court are:

    Affidavit in Opposition dated 9/8/05 (Docket #17)

    Memorandum of Law dated 9/8/05 (also in Docket #17)

    Appendix Volume I, containing Exhibits 1-8 (Docket #20)

    Appendix Volume II, containing Exhibits 9-21 (Docket #21)

    Appendix Volume III, containing Exhibits 22-32 (Docket #22)

    Transcripts - 5 volumes (including pretrial, voir dire,
        trial and sentence proceedings)

    Letter dated 1/4/0[6] (Docket #23).

    If I refer to one of the exhibits to ADA Zucker's Appendix, I will merely refer to "Exh. __."  If I refer to one of petitioner's exhibits, I will refer to "Pet. Exh. __" and also give the number of the Docket Item in which that exhibit appears.

A Summary of the Seven Grounds in the Amended Petition
(filed December 2002)

Myers's Amended Petition asserts seven "grounds," which he

details in 63 pages annexed to the standard habeas form.  I will

follow ADA Zucker's lead and quote the language of each "ground"

without quoting the "supporting facts."

Ground one: [(A)] trial counsel was ineffective in numerous
ways regarding the defense of accident and interrelated issue of
intent, the court's charge on accident and intent as it related
to petitioner's culpability for murder in the second degree or,
alternatively the lesser included offense of manslaughter in the
first degree; and (B) appellate counsel was ineffective for
failing to raise this issue on petitioner's direct appeal.

**[Justice Cirigliano ruled that part "A" of this claim was
procedurally defaulted.  As to part "B", the Appellate Division
denied Myers's petition for *coram nobis;* any suggestion that
appellate counsel was ineffective is frivolous and can be refuted
by simply reading the 70-page appellate brief by Mr. Richman of
Legal Aid. (Exh. 12).]**

Ground two: prior defense counsel [Mr. Rawlins] was
ineffective in his handling of the extreme emotional disturbance
defense (EED), in that defense counsel's premature abandonment
and ineptitude surrounding the [EED] defense at the pre-trial and
trial stages, ultimately, deprived petitioner of (A) his right to
effective assistance of counsel for pleading purposes, pretrial
and trial stages; and (B) [the ability to] plead and avail
himself of the EED defense at the pre-trial stages and trial.

**[The Legal Aid appellate attorney declined to pursue this ground.
Myers presented it to the Appellate Division in a <u>pro</u> <u>se</u>
supplemental brief.]**

Ground three: trial counsel was ineffective in numerous ways
in handling the justification defense.

**[This was one of the two grounds presented by Legal Aid.]**

Ground four: violation of *Brady*, related prosecutorial

misconduct and related ineffectiveness of trial counsel.

**[This was the other ground presented by Legal Aid.]**

Ground five: trial counsel was ineffective, in that, trial counsel prematurely abandoned the defense of insanity at the pretrial and trial stages.

**[Justice Cirigliano ruled that this claim was procedurally defaulted.  He also noted that there was no evidence that Myers was suffering from a mental disease or defect.]**

Ground six: (1) there existed a potential conflict of interest between defense counsel [Mr. Rawlins] and petitioner which the court was made aware of prior to trial and which the court failed to hold a hearing upon; (2) there existed an actual conflict of interest which the court was made aware of prior to trial and which the court failed to hold a hearing on; (3) such conflicts of interest, ultimately caused prejudice to the defense and facilitated trial counsel in rendering ineffective assistance of counsel at the pre-trial stages and trial; and (4) there existed a conflict of interest and numerous problems between petitioner and defense counsel who[] represented petitioner at sentencing [Mr. Kirton], ultimately, problems which prejudiced the petitioner at sentencing.

**[The claims that Mr. Rawlins had a conflict of interest were based on the fact that Myers's mother did not make full payment of the fee.  Justice Cirigliano ruled that these claims procedurally defaulted.  The claim about Mr. Kirton seems to have never been presented to the state courts at all; I recommend that our Court simply dismiss it pursuant to 28 U.S.C. § 2254(b)(2) because Myers has made no showing that he was prejudiced at sentencing.]**

Ground seven: trial counsel was ineffective, in that, (A) he failed to interview and call forth a potential witness for the defense [the superintendent of the apartment building]: and (B) trial counsel in collaboration with the trial court and the prosecutor, allowed the jurors to be misled, tampered with, and ultimately, infected to the degree [that], petitioner was prejudiced and received an unfair trial.

**[Justice Cirigliano ruled that part "A" was a "tactical decision" on a "collateral issue" and hence not ineffective assistance of counsel.  Part "B" appears to refer to the fact that Justice Cirigliano decided to replace a sitting juror with an alternate**

**on the last day of trial, with the agreement of Mr. Rawlins and over the "vociferous objection" of ADA Ianucci (Tr. 712).]**

Grounds one "A", five and six are procedurally defaulted.

Myers's petition includes three grounds that were dismissed by the state courts based on state law procedural grounds pursuant to CPL 440.10. If "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar," then it has made its decision not on a constitutional basis but on an independent and adequate state ground. *Levine v. Commissioner of Correctional Services*, 44 F.3d 121 (2d Cir. 1995), *citing Harris v. Reed*, 109 S.Ct. 1038, 1042-43 (1989). A federal habeas Court should not address such a claim unless the petitioner has shown (1) cause for his failure to raise the claim in a manner that complied with the state law requirements and (2) resulting prejudice, *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004), citing *McCleskey v. Zant*, 499 U.S. 467, 494, 111 S.Ct. 1454 (1991) and *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708 (1976), or (3) his "actual innocence," that is, "factual innocence." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611 (1998).

Myers has not shown that the exceptions should apply to him. Accordingly, our Court need not reach the merits of the following three grounds.

Ground one "A" refers to a claim that Mr. Rawlins failed to

request a specific instruction on the defense of accident, and
that he made matters worse by "denigrating the accident defense"
in his summation.  Myers presented this claim in his third 440.10
motion.  Justice Cirigliano ruled that

> counsel's asserted errors with respect to his
> handling of the defense of accident are
> matters of record and were or could have been
> reviewed on direct appeal.  They are
> therefore barred by CPL 440.10(2)(a).

(11/17/03 decision at p. 11; Exh. 24.)

Ground five refers to a claim that Mr. Rawlins failed
to inform Myers about the insanity defense.  Myers presented this
claim in his third 440 motion.  Justice Cirigliano ruled that
this claim could have been presented on direct appeal.  He also
ruled that it was

> completely unsubstantiated.  Specifically,
> defendant has submitted absolutely no
> documentation or evidence that he was
> suffering from a mental disease or defect
> within the meaning of Penal Law section
> 40.15.  It is therefore barred by CPL
> 440.10(3)(c); 440.30(4)(b).

(11/17/03 decision at pp. 11-12; Exh. 24.)

Ground six refers to a claim that Mr. Rawlins had a
conflict of interest because Myers's mother had stopped paying
him and because she had threatened to file a claim against him
with the State Bar Disciplinary Committee.  Myers presented this
claim in his third 440 motion.  Justice Cirigliano found that
Myers should have raised this claim on direct appeal or in his

-9-

prior 440 motions.  Therefore, this claim was barred under CPL 440.10(2)(c) and 440.10(3)(c).  (11/17/03 decision at p. 12; Exh. 24.)

The Appellate Division issued a simple denial (Exh. 25) of Myers's request to appeal those three rulings in Justice Cirigliano's 11/17/03 decision.  Therefore, the 11/17/03 decision "represents the last reasoned opinion" on those three claims.  The procedural bars constitute independent and adequate state grounds precluding review on federal habeas.  *See, Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594 (1991).

I shall now discuss the remaining four grounds in the following order: three, four, two, seven.

**Ground three**: **The claim that Mr. Rawlins was ineffective in numerous ways in handling the justification defense**.

Mr. Rawlins states: " I concentrated on the justification defense because I thought that was the most applicable in this case." (11/5/02 Aff. at ¶ 2.)  In the amended petition (pages 6A, 6A1-4), Myers makes four specific criticisms about Mr. Rawlins's handling of the justification defense.  Each of these criticisms was presented and rejected on direct appeal. [2]  These criticisms assert:

(1) Mr. Rawlins should not have requested an instruction on duty to retreat. (P.L. § 35.15(2)(a)(I).)  That request merely highlighted the lack of support for the defense of

_____

[2] Criticisms 1, 2 and 3 were raised in Mr. Richman's brief to the Appellate Division; criticism 4 was raised in Myers's pro se appellate brief.

justification in defense of person. There was no evidence at trial that Young had a weapon or, except for Myers's testimony, that Young was otherwise threatening Myers. That is, there was no basis to convince the jury that Myers <u>reasonably</u> believed that Young was about to use deadly physical force, or that Young was "the initial aggressor."

(2) Mr. Rawlins should have requested an instruction on the defense of home because it fit better with the evidence than defense of person. [3]

(3) Mr. Rawlins's summation did not relate the facts to the law of justification, did not explain deadly physical force, and did not attempt to convince the jury that Myers was, or why he was, justified. Mr. Rawlins made it easy for the jury to find that the prosecution disproved the justification defense.

(4) Mr. Rawlins should have prevented the judge's sustaining of ADA Ianucci's objection when Myers started to testify about his previous experience "with my alleged son's mother." (Tr. 519.) Or, he should have convinced Justice Cirigliano to reverse himself and overrule that objection. Sustaining the objection precluded the testimony that would have shown why Myers's fear was reasonable.

(See pp. 35-47 of Mr. Richman's brief (Exh. 12) for thorough argument on criticisms 1, 2 and 3; for a succinct summary, see his 6/15/01 letter requesting leave to appeal to the Court of Appeals (Exh. 17), p.2 n.1.)

In rejecting the first three criticisms, the Appellate

---

[3] New York Penal Law §35.20 says: Justification; use of physical force in defense of premises and in defense of a person in the course of burglary
                      *                 *                 *
                3. A person in possession or control of, or licensed or privileged to be in, a dwelling or an occupied building, who reasonably believes that another person is committing or attempting to commit a burglary of such dwelling or building, may use deadly physical force upon such person when he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of such burglary.

Division stated:

> Defendant testified that the shooting was an accident, and this was the core of his defense, although a justification defense based on use of deadly force in defense of persons was also raised.
>
> Defendant now faults his trial counsel for failing to also assert a justification defense based on use of deadly force against a burglary. (Penal Law § 35.20). However, under the facts presented there was a considerable inconsistency between such a defense and the accident defense. Although inconsistent defenses are permitted by law, their hazardous nature is well established. Here, counsel's handling of the justification defense could not have deprived defendant of a fair trial.

728 N.Y.S.2d at 127 (citations omitted).

The Appellate Division's determination was not contrary to, or an unreasonable application of, the U. S. Supreme Court's holdings concerning claims of ineffective assistance of counsel. I agree with Mr. Richman that Mr. Rawlins should have presented a better closing argument. But Mr. Richman and Myers have failed to meet the second prong of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984):

> . . . [T]he defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless the defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

The reviewing court need not analyze the lawyer's performance if it first determines that the defendant suffered no prejudice:

> . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Even if Mr. Rawlins's performance had been above average, there is no reasonable likelihood that the verdict would have been different. Myers had an absolute right to testify to the inconsistent defenses of accident and justification. However, as the Appellate Division noted, inconsistent defenses are "hazardous;" they tend to denigrate each other. Moreover, the trial record forced Mr. Richman to concede that "[b]ecause there was no claim by appellant that Randy Young had an[y] weapon, it was virtually impossible for the jury, on this record, to conclude that the People had failed to disprove justification." (Exh. 12, p. 46.) Mr. Richman ingeniously argued that Myers would have had a better chance if he had testified that he believed that Young was attempting to commit a burglary. (Exh. 12, pp. 35, 40-41, 45-46.) But I see no reasonable likelihood that the jury would have swallowed an argument that Myers "reasonably" believed that shooting Young was "necessary" to prevent attempted commission of a burglary, as required by Penal Law § 35.20(3).

Mr. Richman presented the Appellate Division with a fourth

criticism of Mr. Rawlins; a less persuasive version of that criticism was presented to the Appellate Division in Myers's pro se supplemental brief and is now presented in his habeas petition. Both versions relate to a possible romantic relationship between Shaniqua Williams and the homicide victim Randy Young. I will discuss these versions under Ground Four.

**Ground four: The *Brady* claim concerning a possible romantic relationship between Shaniqua Williams and the homicide victim. Also: The *Strickland* claim concerning that possible romantic relationship**.

ADA Ianucci suspected that the deceased and Shaniqua Williams might have been lovers at one time, and that this might have motivated Myers to shoot the deceased. The ADA offered a manslaughter plea if Myers would allocute that this had been his motivation. Apparently, three successive appointed attorneys urged Myers to accept that plea bargain, but he adamantly refused. (Exh. 1, Ianucci Aff. ¶¶ 4-7; Sent. Tr. 52-54; see also Am. Pet'n pp. 5B1-5B6.)

Myers went to trial and sought complete exculpation, on the alternative but inconsistent theories of accident and justification. Both of those theories would have been severely compromised if the jury sensed that the deceased and Williams might have been lovers —- even if there were no evidence that Myers suspected this prior to his argument with the deceased on January 2, 1995.

Unfortunately for Myers, both the accident theory and the

-14-

justification theory (particularly the latter) were undermined by the testimony of Glover and Williams. Williams testified that the deceased had performed no act of aggression. The likelihood that the deceased had been non-aggressive was enhanced by the testimony of Glover, who testified as the very first witness and set the scene as follows. At 7:00 p.m., Young and Glover were with their wives, preparing for a Sunday dinner at Young's apartment. Glover left to run a few errands; Young accompanied him, and they both intended to return to share in the family meal that was already being cooked. As they drove around on Glover's errands, Young asked Glover, apparently on the spur of the moment, to drive him to Williams' apartment building for a visit that Young said would take only "one minute."

As an abstract proposition, it would have been helpful to the defense to try to find some way to impeach the credibility of Glover and Williams. This could include any evidence that the witness had a bias. Evidence that either witness had a bias against Myers could have been very compelling, but apparently none existed. Less compelling evidence would have been any evidence that the witness had a bias in favor of the deceased. For example, the jury knew that Glover had been a close friend of the deceased. As for Williams, any evidence that she had been a lover of the deceased would have been some evidence that she was biased in his favor, but on balance it would have hurt Myers

because it would have led to an inference that Myers deduced a lovers' triangle during his argument with the deceased in the presence of Williams.

ADA Ianucci possessed two documents suggesting that Williams and Young had a romantic relationship during March 1994.  It is undisputed that he provided defense counsel with one of these documents (a report of an interview with Young's friend Glover). It is unclear whether he provided defense counsel with the other document (the notes of Young's parole officer).

Shortly after the homicide, ADA Ianucci had requested Detective Edwin Fennell to interview Glover.  The detective's interview report was turned over to defense counsel.  The detective reported that Glover said:

> RANDY [YOUNG] and WILLIAMS worked in Charlies, a club[,] for approximately two months as security at the door (167th & Webster), as far as I know Randy met _____ at the club, then after sometime [,] Randy had a misunderstanding with his wife, he moved in with Williams for about a month. They were defiantly [sic] Lover's [sic] for a short period of time.
> I don't know the relationship was in her house, but Randy did sleep on the couch at Williams apartment.

(See Exh. 22 at subexhibit H.)  At trial, Mr. Rawlins marked this detective's report as Defense Exhibit A for identification.  He used part of it during his cross-examination of Glover (Tr. 80-81), but he did not ask Glover whether Young and Williams had ever been lovers.  If that question had been put to Glover, I

-16-

assume he would have testified that he knew or suspected that the two had been lovers "for a short period of time" about ten months prior to the shooting.  Such information would, on balance, have hurt the defense case, as I have explained above.

ADA Ianucci also had the same information from a second source.  Prior to trial he contacted parole Officer Domingo Graciani, who had been supervising Young in March 1994, when Young was on parole.  The parole officer had his notes about Young, and supplied them to ADA Ianucci.  (See Sent. Tr. 49-52.) Two of these notes are now attached (as Exh. G) to the first 440 motion (Exh. 5).  The first note is on a "Chrono Face Sheet." Under "Residence" the parole officer made this notation about Randy Young:

> 3/7/94 653 E 182nd St Apt 1A . . . - friend - Shaniqua Williams

The second note is on one page from five pages of "Chrono Notes." There, the parole officer wrote the following statements about Young:

> 3-8-94 . . . relocated
>
> 3-11-94 . . . People residing in [the building at the] address given claim [they] don't know subj [Young] or Ms. Williams
>
> 3-22-94   Subj [Young] reported - claims residing there - there are t[w]o 1A buttons - continues expressing anger toward exwife.
>
> 3-22-94   Met subj [Young] and subj[ect's] g/f Shaniqua Williams - no changes

. . . It is apartment "A" not 1A.

The parole officer's notes corroborated the information in the Glover interview report.  It is undisputed that the ADA provided defense counsel with the Glover report.  It is unclear whether the ADA provided any of Myers's various defense attorneys with the parole officer's notes.  Myers asserts that they were not provided and that they constituted *Brady* material that could have been used to confront Williams.

On direct, at Tr. 303-08, Williams testified as follows. From November 1993 to March 1994, she had worked at a club where Young also worked.  When she left that job in March 1994, Young was still working there.  During the remaining nine months until the night of January 2, 1995, she had not seen him.  She had never discussed Young with Myers and, as far as she knew, Young and Myers did not know about each other.  On cross, she testified as follows:

> Mr. Rawlins:  You said it was unusual for somebody to come to your house at 10 o'clock at night?
>
> Williams:  Very unusual.
>
> Mr. Rawlins:  Never been at your house before?
>
> Williams:  No.
>
> Mr. Rawlins:  Did you have a relationship with Randy Young?
>
> Williams:  No.

(Tr. 373.)  Later, she repeated that she never had a conversation

-18-

with Myers about Young, and never mentioned Myers's name to
Young.  (Tr. 455.)  When Young stood at her door, she did not say
anything to tell Myers who Young was. (Tr. 456.)

> Mr. Rawlins:  Now this friend Randy, he knew you
> quite well?
>
> Williams:  He knew me.  Hmm-hmm.

(Tr. 457.)  Later, at Tr. 467-68:

> Mr. Rawlins:  I'm sorry.  I didn't quite
> understand when you last saw Randy.  Was that November
> of '93 or March of '94?
>
> Williams:  The last time I saw him was
> in '94, March.  He started working in '93, in November.
>
> Mr. Rawlins:  Had you spoken with him over
> the telephone?
>
> Williams:  No.
>
> Mr. Rawlins:  So you hadn't seen him from
> March '94 until January of '95?
>
> Williams:  No.  I haven't.
>
> Mr.  Rawlins:  And you haven't spoken to him?
>
> Williams:  No.  Not that I can remember.

The *Brady* claim was presented in the first 440 motion.

Justice Cirigliano rejected it in a decision dated February 5,

1999.  He wrote:

> Shaniqua Williams's testimony has
> already been set forth above.  The defendant
> contends that this testimony was perjurious
> in that she never revealed that she and the
> victim had been lovers.  To support this
> claim, defendant has submitted a report made
> by the victim's parole officer in which the
> victim stated that he had resided with Ms.

-19-

Williams as a "friend" several months earlier.

First, Ms. Williams has never conceded that she and the victim had been lovers or even the accuracy of this out of court statement.  However, and more to the point, even if true, it is immaterial.  The defendant never claimed that he shot the victim as a result of the victim's sexual relationship with his fiance[e].  In fact, the defendant refused to accept the plea under such theory or to submit such issue to the jury.  Moreover, absent such theory, the document itself was inadmissible evidence on a collateral issue. (See, People v. Washington, 178 A.D.2d 349.)  [I disagree with this last sentence.  Evidence of bias is never "collateral."  However, this particular evidence of possible bias would, on balance, have hurt Myers; it would have supplied a motive for the shooting, and would have undermined the defenses of accident and justification.]

With respect to Albert Glover, . . . When interviewed by police officer Edward Fennell, Mr. Glover stated that it was his understanding that the victim and Ms. Williams had been lovers for a short period of time.  The alleged perjury is apparently that Mr. Glover did not volunteer this belief at trial.  Again, it was not brought out because it was not in the defendant's interest to bring it out because it supplied a motive for the shooting and was inconsistent with the theories of the defense. [FN2] (Justice Cirigliano's FN2 said: For this reason defense counsel's decision not to [e]licit such testimony was not ineffective assistance of counsel. (People v Benevento, 91 NY2d 708.).)

Defendant next claims that the People failed to turn over to him the police interview report with respect to Mr. Glover and the parole officer's report with respect to the victim, both referred to above.

Defendant asserts that the former was a
<u>Rosario</u> violation and the latter a <u>Brady</u>
violation.  Both are neither.

Officer Fennell's report . . . was
turned over to the defense. . . . As to the
parole report, it was not <u>Brady</u> material for
the reasons stated above. (<u>People v. Vasquez</u>,
214 AD2d 93.)  Assuming, arguendo, it was,
the defendant was not prejudiced inasmuch as he already had offic
disclosed the purported affair between the victim and Ms.
Williams.  There is thus no reasonable probability that its
disclosure to the defense, assuming it was not disclosed [FN4],
would have resulted in a different outcome.  (Justice
Cirigliano's FN4 said:                    Wheth
                                          er
                                          this
                                          [paro
                                          le
                                          offic
                                          er's]
                                          repor
                                          t was
                                          or
                                          was
                                          not
                                          physi
                                          cally
                                          turne
                                          d
                                          over
                                          is
                                          uncle
                                          ar.
                                          None
                                          of
                                          the
                                          attor
                                          neys
                                          invol
                                          ved
                                          can
                                          defin
                                          itely
                                          recal
                                          l one
                                          way
                                          or

-21-

the
other
,
altho
ugh
defen
se
couns
el
was
aware
of
it.)

(Exh. 6.)  Regarding that last question of whether the parole

officer's report was actually turned over, differing affirmations

had been submitted by ADA Ianucci (Exh. 1), by Mr. Rawlins (Exh.

30) and by one of Myers's earlier attorneys Anthony J. Ventura

(Exh. 5 at subexhibit E).

Myers appealed this denial of his first 440 motion.  The

appeal was consolidated with the direct appeal.  As I mentioned

earlier, the direct appeal criticized Mr. Rawlins in several

respects, including his failure to use the Glover interview

report to raise the possibility that Young and Williams had been

lovers.  The Appellate Division ruled as follows:

> Defendant also faults his trial counsel
> for failing to confront his fiancee, who was
> the People's principal witness, with evidence
> of a prior intimate relationship between her
> and the victim.  We find that defendant's
> right to a fair trial was not compromised
> because such a strategy would have had little
> or no impact on the witness's credibility.
> Moreover, this strategy could have backfired
> by suggesting to the jury that defendant knew
> of the prior relationship, and thus supplying
> a motive for the killing.  Accordingly,

counsel's failure to make use of this
information did not compromise his right to a
fair trial.

Defendant's related claim that the
People violated *Brady v. Maryland* (373 U.S.
83, 83 S.Ct. 1194, 10 L.Ed.2d 215) by
withholding further information [from the
parole officer] about the alleged prior
relationship between the witness and victim
does not require reversal. In the first
place, the record is inconclusive as to
whether the information at issue was actually
turned over to the defense. In any event,
the additional information was cumulative of
the information already in defendant's
possession. Moreover, for the reasons
previously stated, a line of defense based on
the alleged prior relationship had no
reasonable possibility of affecting the
verdict (see, *People v. Vilardi*, 76 N.Y.2d
67, 77, 556 N.Y.S.2d 518, 555 N.E.2d 915).

728 N.Y.S.2d at 127-28. The Appellate Division's decision was

not contrary to, or an unreasonable application of, the U.S.

Supreme Court's holdings in *Brady v. Maryland*, *Strickland v.*

*Washington* or their progeny.

**Ground two: <u>The claim concerning extreme emotional
disturbance ("EED").</u>**

Justice Cirigliano ruled that most or all of this claim was

procedurally barred. However, I will discuss its merits because

Myers has placed so much emphasis on it. More than a year after

the jury's 1997 verdict, Myers began claiming that EED [4] should

---

[4] The partial defense of extreme emotional disturbance ("EED") is set
forth in Penal Law § 125.25, the section defining murder in the second degree:

1. With intent to cause the death of another person, he causes the
death of such person or of a third person; except that in any
prosecution under this subdivision, it is an affirmative defense that:

have been argued at trial. However, presenting an EED argument at trial almost certainly assures at least a manslaughter conviction, and it provides no assurance against a murder conviction. In 2002 (by which point he had served 7 years), Myers began claiming that, if his attorneys had spent more time with him, he would have pleaded guilty to manslaughter. (See Exh. 19, *coram nobis* mem. pp. 13, 25-26.)

I turn first to the "second 440 motion," (Exh. 8). [5] It was submitted in November 1999 by attorney Michael Warren. [6] It suggested, for the first time, that EED and insanity would have been viable defenses for trial. It asserted that Mr. Rawlins was ineffective for not properly exploring, prior to trial, the possibility of a defense of insanity and/or a partial defense of EED. Mr. Warren wrote:

> Trial counsel's failure to meet with the
> defendant prior to trial also precluded him
> from utilizing insanity or extreme emotional
> disturbance as viable defenses on defendant's
> behalf. The background of defendant here,

---

(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . .

[5] This motion was captioned "Notice of Motion pursuant to § 440.10(h) and reconsideration of prior motion."

[6] Myers claims he was unaware that his mother had hired Mr. Warren. (See e.g., Am. Pet'n, pp. 5B-13.) Even if true, that is irrelevant for our purposes.

having received threats in a prior incident
similar to this, had a direct relationship to
his state of mind when confronted by the
decedent.

(Exh. 8, p. 6.)

Justice Cirigliano denied the second 440 motion.  In a

decision dated February 29, 2000, he wrote:

> [D]efendant lost the defense of extreme
> emotional disturbance through no fault of
> trial counsel but because the defendant
> refused to accept the offered plea
> bargain.  Having personally made the tactical
> decision that he could convince the jury that
> the shooting was justified and/or accidental
> rather than accept a plea to manslaughter in
> the first degree, the defendant cannot be
> heard to blame counsel when such strategy
> failed.

(Exh. 9 at pp. 4.)

Mr. Richman declined to include the EED claim in his August

2000 brief to the Appellate Division.  He told Myers that Myers

could raise it in a pro se supplemental brief, and Myers did so.

In his pro se submissions to the Appellate Division, Myers

elaborated somewhat on Mr. Warren's vague reference to "the

background of the defendant here, having received threats in a

prior incident. . . ."  Myers acknowledged that he had refused

the plea offer of EED manslaughter.  He claimed that his refusal

had been based on a high-minded refusal to give a false

allocution that he had any knowledge of Young prior to January 2,

1995.  He now felt that a better EED theory would be to invoke an

alleged "similar prior incident [that] involved a [different]

woman he [had been] closely involved with." (See Exh. 13 at pp. 60, 63-65, Exh. 15 at pp. 9a-14.)  He seemed to suggest that this alleged past incident had caused him to have a reflexive fear of Young, even though Myers had no knowledge of Young prior to January 2, 1995.  He did not claim that he had presented this theory to anybody prior to trial.

The Appellate Division did not specifically mention the EED aspect of the claims about ineffective assistance of counsel. However, in its May 2001 affirmance, the Appellate Division did state:

> Viewing the trial record along with the submissions on the judgment to vacate judgment as a whole, we conclude that defendant received meaningful representation. Trial counsel's alleged omissions did not "seriously compromise" defendant's right to a fair trial.

728 N.Y.S.2d at 127.

In June 2003, in the third 440 motion (Exh. 22), Myers revisited the EED argument in more detail.  He provided a long narrative in a 37-page affidavit dated 6/12/03 (Exh. 22 at subexhibit 5).  At pages 20-31 of that affidavit, he alleged a series of personal and emotional events that he considered relevant to possible defenses of EED and insanity.  He summarized those events as follows:

> Defendant has been the victim of a prior assault where he was almost killed by the paramour of a prior fiancee.  Defendant suffered mental infirmities from such

> incident and the circumstances of such prior
> experience are almost identically similar to
> the setting and events which unfolded on the
> night of January 2, 1995, for which defendant
> presently stands convicted.  During the night
> of January 2, 1995, as the events unfolded at
> the doorway of the apartment, defendant saw
> the face of his assailant from the prior
> experience and heard voices and sounds
> relating to such prior experience. . . .
>
> Defendant has been the recipient of
> professional help for his mental infirmities
> before and after the incident for which he
> stands convicted.

(Exh. 22, 6/10/03 Myers Aff., p. 3.)

In this third 440 motion, Myers did not say that he (or anyone else) had related these alleged events to any of the four attorneys who represented him prior to trial and at trial.  After the trial, Myers's mother related some of these alleged events to the fifth attorney, Mr. Warren.  See Exh. 22, Mem. of Law, p. 5, where Myers says that Mr. Warren wrote the second 440 motion "relying solely on his conversations with defendant's mother." Nevertheless, the third 440 motion asserted that "if [Mr. Rawlins] had explained such defense properly to defendant, Myers would have taken a plea under the defense of EED under [this] theory." [7]  (Id., pp. 20-21).  In these same pages, written six years after the trial, Myers said: "EED offered the only realistic escape from the likelihood of a conviction of murder in

_____

[7] This was the first time he flatly told Justice Cirigliano that he would have pleaded guilty to manslaughter.  However, he had earlier stated this to the Appellate Division in his 5/17/02 *coram nobis* petition (Exh. 19), which was denied by the Appellate Division on 5/20/03 (Exh. 20).

the second degree." (Id., p. 21.)  As for his trial testimony
(Tr. 510: "The gun goes off.  You know, I had no interest in
shooting this brother."), Myers now wrote: "accident . . . was
about the closest word petitioner could think of in his layman
attempt to explain his extreme emotional disturbance." (Exh. 22,
p. 21.)

Myers makes the highly unlikely assumption that ADA Ianucci
would have settled for an EED plea based on (a) Myers's alleged
prior experience with his previous girlfriend's boyfriend, and
(b) a claim that Myers shot Young because "he saw the face of his
[alleged prior] assailant . . . and heard voices and sounds."
However, ADA Ianucci's statements at sentencing (Sent. Tr. 47-54)
and in his affirmation (Exh. 1) indicate that he strongly
believed there had been a lovers' triangle involving Myers,
Williams and Young.  There is no indication that the prosecution
would have settled for a manslaughter plea on any other basis.

In his denial of the third motion, Justice Cirigliano
rejected the assertion that Myers would have pleaded guilty to
manslaughter:

> Lastly, counsel's asserted failure to
> properly explain the EED defense is barred
> based on such issue having been previously
> determined on the merits within the
> defendant's direct appeal and prior CPL 440
> motions. (CPL 440.10[2][a]).  It is, in any
> event, meritless.  Defendant was offered a
> plea of manslaughter in the first degree
> based on the defense of EED.  He rejected it
> ostensibly because he would have been

-28-

> required to allocute, falsely he asserts,
> that he knew of a prior relationship between
> his fiancé[e] and the victim.  The evidence
> at trial, however, clearly showed that no
> later than the moment defendant opened the
> door and saw the victim standing outside his
> fiance's apartment he knew something had been
> going on [see Tr. 509: "I see there's
> something wrong because Shaniqua is acting
> funny . . . she has this plastic sheepish
> look on her face."] and he was offered a plea
> on that basis.  (See Sentencing Transcript at
> 52.)  <u>Moreover, the idea that defendant
> rejected the plea upon such ground and then
> somehow failed to discuss possible
> alternative grounds, such as his prior
> similar traumatic experiences, with counsel
> is incredible [if he had actually suffered
> those prior experiences].</u>  While it may be
> that plea discussions between defendant and
> counsel were truncated, as this Court has
> repeatedly observed, <u>defendant had no
> intention of pleading guilty to anything,
> whatever the offer</u>.

(Exh. 24, 3/17/03 decision at pp. 12-13 (emphasis added).)

In our Court, these findings of fact by the trial judge are presumed to be correct, and this presumption can only be overcome by "clear and convincing evidence." § 2254(e)(1).  Myers has not made a showing of "clear and convincing evidence."

Myers relies heavily on *DeLuca v. Lord*, 858 F. Supp. 1330 (S.D.N.Y. 1994), *aff'd*, 77 F.3d 578 (2d Cir. 1996).  In that case, District Judge Ward granted habeas and the Second Circuit (by a vote of 2-1) affirmed because of the lawyer's failure to preserve and prepare for a defense of extreme emotional disturbance.  Myers claims that his case was very similar to the *DeLuca* case.  On the contrary, *DeLuca* is distinguishable in

significant respects.

First.  Judge Ward found that DeLuca's attorney "made some reference to the EED defense in his early discussions with his client," but he did not adequately explain the EED option to her, and he did not completely understand it himself. (858 F. Supp. at 1348.)  I see no indication that the prosecutor ever offered a manslaughter plea to DeLuca, or that the defense ever sought such a plea.  By contrast, Myers was offered a manslaughter plea based on EED.  Prior to Mr. Rawlins, three successive attorneys urged Myers to accept that plea, but he repeatedly refused.  (Exh. 1, Ianucci Aff. ¶¶ 4-7,; Sent. Tr. 52-54.)

Second.  If DeLuca had presented a defense case, she and other witnesses would have presented powerful evidence that the victim had raped DeLuca several hours before the homicide. (858 F. Supp. at 1350-52.)  The Second Circuit wrote: "If the jury in this case believed that Bissett had raped DeLuca, it would not have needed a psychiatrist's help to understand that she might have killed him in a state of extreme emotional disturbance." (77 F.3d at 587, n.1.)  By contrast, it is unlikely that Myers (with or without a psychiatrist) could have persuaded a jury that he was under an extreme emotional disturbance merely because (a) Williams gave him a "sheepish look" and (b) when he looked at Young he heard voices and saw the face of an alleged attacker from long ago.  (Tr. 509; Exh. 22, Myers Aff., p. 3.)

If Mr. Rawlins had explored and developed the revised EED theory that Myers now prefers, there is no reasonable likelihood (a) that the prosecutor would have offered a manslaughter plea on the revised theory, or (b) that Myers would have accepted it, or (c) that the jury would have voted for manslaughter rather than murder.  In short, Myers's claims concerning EED have no merit.


**Ground seven: trial counsel was ineffective, in that, (A) he <u>failed to interview and call forth a potential witness</u> for the defense: and (B) trial counsel in collaboration with the trial court and the prosecutor, <u>allowed the jurors to be misled, tampered with, and ultimately, infected </u>to the degree [that], petitioner was prejudiced and received an unfair trial.**

(A)  The potential witness was the superintendent of the apartment building where the homicide occurred.  Myers claims the superintendent could have made two minor points.  <u>First</u>. Glover had testified at trial that he went into a nearby store, where he watched TV while Young went into the apartment building. (Exh. 8, p. 10.)  Myers claims that the superintendent could have testified that that store had been closed on January 2, 1995. Myers seems to think that impeaching Glover with this piece of information would have been meaningful; I disagree.  If Glover was mistaken (or even lying) about a store being open, or which store he went into, this was a collateral issue.  It is not entirely clear from the record which store Glover was talking about.  In any event, Clifford Hille, a representative of the building's managing agent, did testify on the defense case; he

-31-

said that a certain store had been vacated by the homicide date. (Tr. 598-99, 607-08.)  Second.  Williams testified that her apartment windows had "bars."  Myers claims that they were merely "child guards." Justice Cirigliano ruled that this issue was merely a "collateral issue."  (Exh. 9, p. 5.)  If Myers felt it was important, he could have mentioned it in his own testimony. There was no need to call the superintendent to testify that the bars were child guards.

In his 2/29/00 decision denying the second 440 motion, Justice Cirigliano commented: "In any event, Mr. Rawlins declined to call the superintendent because he was a drunk." (Exh. 9, p. 5; see 1/14/00 Affirmation of ADA Edward L. Schnitzer (part of Exh. 8.))

(B)  Myers's allegation of jury tampering has no merit whatsoever.  The incident involving the jury was as follows. After all the testimony had been completed, but before the summations, one juror reported to the courtroom deputy that she was alarmed because she noticed that Myers's mother was in the courtroom with a camera on her lap.  Justice Cirigliano consulted with counsel, and then, in their presence, interviewed Ms. Myers and each of the jurors, some more than once.  Ms. Myers handed up the camera to the judge; she said she had it with her because she had just used it to photograph the child guards on the apartment windows.  After some further discussion, court adjourned for the

Room 1340, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) *(per curiam)*; 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to the District Judge.

DOUGLAS F. EATON
United States Magistrate Judge

Dated:    New York, New York
          June 8, 2006

Copies of this Report and Recommendation (and of the annexed chronology) were sent by mail on this date to:

Christopher Myers, #97A6983
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

Jonathan Zucker, Esq.
Assistant District Attorney
Bronx County
215 East 161st Street
Bronx, NY 10451

Hon. Jed S. Rakoff

Chronology of the state court proceedings in People v. Christopher Myers, from 1997 to 2005

| | |
|---|---|
| 1/2/05 | Myers kills Randy Young, surrenders ten days later |
| 2/10/97 | Jury verdict |
| 2/12/97 | Pro Se 330.30 motion (EXH. 2) |
| 10/21/97 | Justice Cirigliano denies 330.30 motion (argued by attorney Marlon Kirton) (EXH. 3) |
| 10/21/97 | Justice Cirigliano sentences Myers to 20 years to life (Tr. Vol. 5) |
| 1/30/98 | Pro Se Article 78 petition to compel reversal of denial of 330.30 motion (EXH. 4) |
| 2/26/98 | Appellate Division denies Article 78 petition |
| 3/14/98 | Court of Appeals denies leave to appeal the denial of the Article 78 petition |
| 5/4/98 | Pro Se 440.10 motion ("first 440 motion") (EXH. 5) |
| 2/5/99 | Justice Cirigliano's written decision denying the first 440 motion (EXH. 6) |
| 5/11/99 | Appellate Division Justice Wallach grants leave to appeal, and the appeal of the denial is consolidated with the direct appeal (EXH. 7) |
| 11/9/99 | Motion to reargue first 440 motion plus new motion by Michael Warren, Esq. to vacate under 440.10(h) ("second 440 motion") (EXH. 8) |
| 2/24/00 | Pro se motion to reargue second 440 motion (EXH. 11) |
| 2/29/00 | Justice Cirigliano's written decision denying second 440 motion (EXH. 9 ) |
| 5/25/00 | Justice Cirigliano denies pro se motion to "again" reargue second 440 motion (EXH. 11) |
| 7/13/00 | Appellate Division denies leave to appeal the denial of the second 440 motion (EXH. 10) |
| 8/25/00 | Legal Aid Attorney Jeffrey I. Richman files appellate brief (70 pages) (EXH. 12) |
| 12/29/00 | Myers files Pro Se Supplemental Brief (70 pages) (EXH. 13) |
| 3/20/01 | People's Brief in Opposition (EXH. 14) |
| 3/30/01 | Pro Se Reply Brief (EXH. 15) |
| 5/17/01 | Appellate Division affirms conviction, and affirms the denial of the first 440 motion (283 A.D.2d 258) |

| | |
|---|---|
| 6/12/01 | Pro Se motion to "reargue or resettle" the order of affirmance (EXH. 16) |
| 6/15/01 | Attorney Richman's letter requesting leave to appeal to the Court of Appeals (EXH. 17) |
| 6/21/01 | Pro Se request for leave to appeal to the Court of Appeals (EXH. 18) |
| 8/31/01 | Judge Levine denies leave to appeal (96 N.Y.2d 922) |
| 10/4/01 | Appellate Division denies the 6/12/01 motion (EXH. 16 ) |
| 5/17/02 | Pro Se Coram nobis petition (EXH. 19) |
| 6/21/02 | Pro Se habeas petition filed in our Court |
| 12/30/02 | Pro Se amended habeas petition filed in our Court |
| 5/20/03 | Appellate Division denies coram nobis (EXH. 20) |
| 6/10/03 | Pro Se 440.10 motion ("third 440 motion") (EXH. 22) |
| 9/30/03 | Judge Ciparick denies leave to appeal the denial of coram nobis (EXH. 21) |
| 11/17/03 | Justice Cirigliano denies the third 440.10 motion (EXH. 24) |
| 11/30/03 | Motion to Justice Cirigliano for reargument (EXH. 26) |
| 12/10/03 | Motion to Justice Cirigliano for recusal (EXH. 27) |
| 3/9/04 | Appellate Division Justice Sullivan denies leave to appeal the 11/17/03 denial (EXH. 25) |
| 5/10/04 | Justice Cirigliano denies reargument and denies recusal (EXH. 28) |
| 9/7/04 | Appellate Division Justice Catterson denies leave to appeal from the 5/10/04 denial (EXH. 29) |
| 9/17/04 | Another motion to Justice Cirigliano for reargument on the third 440 motion (EXH. 30) |
| 11/29/04 | Opposition to 9/17/04 motion to reargue (EXH. 31) |
| 12/23/04 | Justice Cirigliano denies the 9/17/04 motion (EXH. 31) |
| 4/27/05 | Appellate Division Justice Saxe denies leave to appeal from the 12/23/04 denial (EXH. 32) |